**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**at COVINGTON**

**CRIMINAL ACTION NO. 06-61-DLB**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**vs.**                          **MEMORANDUM OPINION & ORDER**

**FREDERICK H. PURCELL, JR.**                                          **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on Defendant's Motion to Suppress. (Doc. #14)  The United States filed a written response to this motion. (Doc. #19)  A suppression hearing was held on December 14, 2006.  Assistant United States Attorney Laura K. Voorhees appeared on behalf of the Plaintiff; Wende C. Cross, Esq. appeared on behalf of the Defendant.   The proceedings were recorded by Official Court Reporter Lisa Reed Wiesman.   After the hearing transcript was filed, Defendant filed a post-hearing supplemental brief (Doc. #27), as did the United States (Doc. #28).   Defendant's suppression motion is now ripe for review.

### I.    INTRODUCTION

Defendant was arrested on June 28, 2006 after members of the Southern Ohio Fugitive Apprehension Strike Team (SOFAST) received a crime-stoppers tip that he was preparing to leave the Home Suites Hotel in Florence, Kentucky.  Upon arriving at the scene, the agents spotted him in the parking lot and immediately arrested him for an outstanding warrant.  Following the arrest, officers from both SOFAST and the Northern

Kentucky Drug Strike Force (NKDSF) searched the hotel room occupied by Defendant and his girlfriend, Yolande Crist, during which search they recovered, among other items, the marijuana and firearm that give rise to the charges in the Indictment.

## II.    ISSUE

Defendant seeks to suppress the drugs and firearm seized from the hotel room as having been obtained in violation of his Fourth Amendment rights.   Specifically, he contends that authorities failed to obtain valid consent to conduct a warrantless search of the two bags located inside the hotel room that contained his personal belongings.

## III.    FACTS

Many of the relevant facts in this case are undisputed.  On the morning of June 28, 2006, SOFAST unit members received a Crimestoppers anonymous telephone tip that Defendant Frederick Purcell, an individual known to law enforcement to be a methamphetamine (meth) manufacturer, was a guest at and preparing to leave the Home Suites Hotel in Florence, Kentucky.  Upon receiving the call, agents obtained information that there was an active arrest warrant for Purcell for his escape from another prison facility, where he was serving time for a prior meth manufacturing conviction.  Special Agent John Scott, along with Officer Jennifer Ernst and Sergeant Jeff Hunt, immediately left to apprehend the Defendant.  While en route to Florence, agents learned Purcell had been previously arrested in Cincinnati on a meth manufacturing charge, raising concern about the possibility of a meth lab, and its associated dangers, being on the hotel premises.

When the agents arrived at the Home Suites, they immediately spotted Defendant in the parking lot.  Upon seeing the officers, Defendant dropped his head and allowed the officers to arrest him without incident.  Upon arrival of the Florence Police Department,

Defendant was placed in a police vehicle and remained in the hotel's parking lot throughout the subsequent search of the hotel room.  Agents testified Defendant refused to answer questions following his arrest.

Fearing that Defendant was manufacturing meth at the hotel, Agent Scott and other SOFAST officers proceeded to room 250, the room known to officers as being occupied by Defendant and a female, per the Crimestoppers tip.  Agent Scott arrived at the room and knocked on the door, but no one answered.  Agent Scott testified that he could hear the shower running as well as the sound of fans blowing.  After a few minutes, a female answered the door and identified herself as Yolande Crist.

Ms. Crist testified at the evidentiary hearing that she was high when the agents arrived, having smoked crack that morning, but was aware of her surroundings and able to comprehend what was happening and respond to the officers.  The testifying agents indicated that Ms. Crist appeared to be lucid and aware of her surroundings and communicated with them without noticeable difficulty.

When Agent Scott first spoke with Crist, she told him that she and Fred Purcell were dating, staying at the hotel, and had been there a few days.  He informed Ms. Crist that they had arrested Defendant, which she acknowledged seeing from the window of the room, and asked her if a meth lab was being operated on the premises.  Agent Scott testified that Ms. Crist assured them there was not a meth lab in the room, but "eventually gave us consent" to look around to verify the area was safe.

Agent Scott testified that as they conducted their protective sweep, he observed luggage and various items strewn about the room.  This was corroborated by other officers who testified at the hearing, who said they observed the hotel room to be in a disheveled

state.  Officers testified that there were clothes strewn about the room on the floor and bed, as well as plastic garbage bags and storage containers.  During the hearing, Ms. Crist concurred with this description, elaborating that Defendant is a neat, organized individual and had already packed his belongings, while she is more disorganized and was still in the process of packing her belongings.  Ms. Crist testified that she did not pilfer through Defendant's things, nor did he go through hers.  She explained that while he had never expressly told her not to go through his things, neither would she have ever considered doing so.

Special Agent Scott also testified that during that initial sweep he observed drug paraphernalia – leaves of marijuana and pieces of steel wool.  Upon seeing a butane torch and box fan in the bathroom, Agent Scott contacted ATF Agent Mike Oergel, who then contacted the NKDSF.

After receiving the call, NKDSF Agents Duane Rolfsen and Michael Kappes arrived at the hotel room. Agents Rolfsen and Kappes were called in due to their expertise in processing meth labs. Upon arrival, agents on the scene informed Rolfsen and Kappes of the circumstances and that Ms. Crist had consented to a protective sweep. Agents Rolfsen and Kappes then proceeded to conduct their own protective sweep of the room.  After their sweep, they spoke with Ms. Crist in the hallway for the purpose of attempting to obtain consent to do a full search of the room.

Agents testified that after speaking with Ms. Crist briefly, they received her oral consent to search the room.  At the suppression hearing, Crist could not recall whether she had given express consent for police to sweep the room, then consented again for them to perform a full search of the room.  She did acknowledge though that when she testified

before the grand jury, she stated that she gave officers her consent to search the room. Her hesitation at the suppression hearing appeared directed to whether she had given agents authorization on two separation occasions, rather than just telling them generally that they could search.

The agents asked Crist if there were any dangerous items in the room. She told them there was a firearm somewhere in the room. The testimony differs as to Ms. Crist's physical whereabouts during the search. The agents on the scene testified that Ms. Crist was going back and forth between the hallway outside the room and the doorway into the room while they conducted the search. Ms. Crist testified the door to the room was closed or mostly closed during the search process, and she remained in the hallway. What is undisputed is that she remained in the immediate vicinity while officers searched the room.

The first item searched was a greenish/orange closed duffel bag located next to the door. A woman's purse, Ms. Crist's, had been placed on top of that duffel bag. Agent Rolfsen testified that as he proceeded to search that bag, Ms. Crist told him that the bag belonged to her. However, the ensuing search recovered men's clothing and marijuana. Although Ms. Crist had stated the duffel bag was hers, Agent Rolfsen testified that he believed the contents of the bag belonged to someone else. The testimony is undisputed that neither Agent Rolfsen nor any other officer present asked Ms. Crist to identify any other bags in the room before searching them.

As the search continued, Special Agent Mike Downs located an orange and dark colored backpack on the floor between the bed and the window. Agent Downs placed the backpack on one of the beds in the room and began to search it. Inside he found a firearm, pictures later determined to be of the Defendant's daughters, drug paraphernalia, a knife,

and an identification card bearing the name of Michael Stamper.  Following the search, Agent Downs brought the backpack into the hallway and asked Crist to whom it belonged. She responded that the backpack was hers, but that she was letting the Defendant use it.

Defendant was subsequently charged with crimes associated with the marijuana and firearm.  Specifically, he was indicted for possession of marijuana, in violation of 21 U.S.C. § 844(a); being an unlawful user of marijuana while in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3); being a fugitive from justice knowingly in possession of a firearm, in violation of 18 U.S.C. § 922(g)(2); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  Count 5 is for forfeiture of the subject firearm, a Smith and Wesson, Model 60, .38 caliber handgun.

### III.   ANALYSIS

"There is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search unreasonable except in a few 'jealously and carefully drawn' exceptional circumstances."  *United States v. Watson,* 423 U.S. 411, 427 (1976)(citation omitted).  In this case, the United States must persuade the Court that the warrantless search of the duffel bag and backpack and the seizure of the marijuana and firearm constitute one of those exceptional circumstances.[1]

### A.   Valid Voluntary Consent by Crist

---

[1]In his initial motion, Defendant argued that the seizure of the firearm was unconstitutional, allegedly because the consent to search the hotel room "did not extend to [Defendant's] backpack." (Doc. #14, p. 4)  However, Defendant indicated at the suppression hearing that he was also challenging the authorities' search of the duffel bag in which the marijuana was found, as well as whether Ms. Crist's consent to search was valid.

The Fourth Amendment prohibits searches without a warrant or probable cause with few exceptions, one of which is valid consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). Here, although the United States had no warrant to search the hotel room, it relies upon the oral consent to do so given by Yolande Crist. "[I]t is the government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony'" that Crist's valid and voluntary consent to the search was obtained. *United States v. Worley,* 193 F.3d 380, 385 (6th Cir. 1999)(internal citations and quotation marks omitted). The consent to search must be "freely and voluntarily given." *Schneckloth,* 412 U.S. at 222; *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968). This is a fact question, determined from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227.

Purcell does not challenge Crist's authority, as a co-occupant, to consent to search of the hotel room. But he does contend that as a result of drug induced intoxication, Crist's consent to search was not voluntary. The Court disagrees. For consent to be voluntary, "it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." *United States v. Scott,* 578 F.2d 1186, 1188-89 (6th Cir. 1978). That Crist ingested drugs and even that officers suspected as much does not automatically negate voluntariness of her consent. "Voluntary consent can be given even by a person under the influence of drugs, when that person is coherent and fails to exhibit any visible impairment." *United States v. Griffin,* 1997 WL 487325, at *2 (6th Cir. 1997). Although an unpublished decision, the Court finds *Griffin* to be persuasive guidance on how the Sixth Circuit views this question, particularly given no reported authority from this Circuit to the contrary on this issue.

Agents found drug paraphernalia in the hotel room and Crist testified that she and Purcell had smoked crack earlier that day, and were trying to finish it off before checking out.  She admitted that she was high, but also testified that she did not have any trouble understanding what police were asking her or that she was "blown out" or "stupid from it [meaning the crack]."  That Crist may have been high does not compel a finding that her consent was not voluntary.  Rather, the agents' testimony at hearing was consistent that she appeared to understand and respond appropriately to questions, and was calm and cooperative.  Her mannerisms, while fidgety, did not suggest her faculties were impaired.  Functionally, she was able to walk, talk, and handle conversation appropriately.  She was able to identify her purse, locate her keys inside, and provide them to the officers so that they could search her storage unit.  Each of the officers who testified, with the exception of Agent Rolfsen, said nothing stood out as far as her behavior that would lead them to believe she was high or under the influence.  Agent Rolfsen, who conversed a good bit with Crist, described her eyes as glassy and stated that she may have been a little bit under the influence, but was not intoxicated.

Given these circumstances, "nothing in the record indicates that [Crist] was so impaired as to render her consent invalid." *Griffin,* 1997 WL 487325, at *2.  Defendant did not offer any specific evidence to suggest that Crist was incoherent or unaware of what was going on, or so impaired that officers would have had reason to believe that she could not give valid consent.  The Court finds that her consent to search was voluntary, and therefore valid, and Defendant's motion to suppress will be denied as to this particular challenge.  However, that does not end the Court's analysis.

### B.    Exigent Circumstances / Protective Sweep

The responding officers herein conducted an initial sweep of room 250 to determine whether there was a meth lab on the premises.  In its post-hearing brief, the Government submits that a full search of the room, including the luggage therein, was justified based upon the exigency of the circumstances. (Doc. #28, p. 14) Because this contention is factually and legally unfounded, the Court disagrees.

A warrantless search can be conducted if exigent circumstances exist.  *See United States v. Rohrig,* 98 F.3d 1506, 1515-16 (6th Cir. 1996)(noting four general categories of situations qualifying as exigent, including that of a risk of danger to police or others, such as that presented by a burning building, and recognizing that not every exigency will fall neatly into a category).  To some extent, the degree of "exigency" of the circumstances in this case can be gauged by the fact that officers first sought Crist's consent to check the room for the presence of a meth lab before actually entering the premises.  When officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search.  *Florida v. Jimeno,* 500 U.S. 248, 251-52 (1991).  Agents Scott and Rolfsen explained that there were essentially two consent requests – one to do an initial walk through check for the presence of a lab, and a subsequent request to do a full search of the room.  Their actions in asking a second time for consent, that time to search the room, strongly suggests that the immediate danger was no longer present.  After Agents Rolfsen and Kappes did a check, the exigency no longer existed.  The luggage was not searched on that initial check or sweep of the room.  The standard for measuring the scope of consent is objective reasonableness; that is, whether it is reasonable for law enforcement to believe that the scope of the search included the

-9-

search area.  *Jimeno,* 500 U.S. at 251-52.  There is nothing to suggest that a search of the luggage was necessary as part of the exigency of ensuring there was no meth lab in the room, nor would it be objectively reasonable to find that such a search was within the scope of Crist's initial consent to look around to verify the area was safe.

The Government relies upon an Eighth Circuit case, *United States v. Lloyd,* 396 F.3d 948 (8th Cir. 2005), in an attempt to validate the search of the luggage here as being necessitated by arguably exigent circumstances of a meth lab.  But unlike here, in *Lloyd* there was a noticeable odor of ether detected, and the meth lab was observed in plain view. *Id.* at 954.  It is undisputed that meth labs can be highly volatile and dangerous to others. But a warrantless search of the entire premises of a co-occupied hotel room, including luggage or other containers of a personal size, as part of the exigency of locating and dismantling a meth lab is not reasonable, nor does *Lloyd* support such a proposition were the Court to view the case as authoritative.

In sum, the reasonable inference is that officials were satisfied after the sweep that there was no active, operating meth lab on the premises.  According to Agent Rolfsen's description, when they returned to the hallway to speak to Crist, the focus had changed. They were instead interested in obtaining her permission to do a full search and in knowing whether there was anything that would present a danger to them as they performed that full search.  It was around this time that Crist told them there was a gun somewhere in the room.  While Agent Rolfsen emphasized during his testimony that at least part of their search efforts were aimed at finding the gun, the Government's brief does not suggest nor would the Court accept that the mere presence of a firearm in a hotel room also gives rise

to exigent circumstances justifying a warrantless search of any and all areas where the gun might be located.

### C.    Purcell's Legitimate Expectation of Privacy

Emphasizing that Fourth Amendment rights are "personal," *Rakas v. Illinois,* 439 U.S. 128, 140 (1978), the Sixth Circuit has stated on multiple occasions that "the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005); *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). In order to determine whether a legitimate expectation of privacy exists, courts employ a two-part test: "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; ... Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *King*, 227 F.3d at 743 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)).  Thus, this two-part analysis involves both a subjective and objective component of the defendant's expectation of privacy in the item to be searched.

At the suppression hearing, the United States represented that it does not challenge that Defendant had a legitimate expectation of privacy in his luggage inside of the hotel

room.[2]  This concession is consistent with the conclusion that applicable law would dictate on this point.

In *United States v. Waller*, police officers recovered a firearm from a luggage bag owned by the defendant.  Immediately prior to search, the bag was found closed and had been placed in a bedroom closet in another person's apartment.  In suppressing the search, the court held that the defendant had an actual expectation of privacy in his luggage because he had not informed the occupants of the room about the contents of his bag, he gave them no authority to look inside the bag, and the bag was closed, zipped, and stored in a bedroom closet.  426 F.3d at 844.

In this case, Purcell exhibited an actual, subjective expectation of privacy in the duffel bag and backpack by his actions in placing his personal belongings, including the marijuana and firearm, within the bags rather than leaving them out in the open.  Ms. Crist testified that the duffel bag was given to Purcell for his use by a friend of his.  And although she testified that the backpack belonged to her, she also testified that she had given it to Purcell for his exclusive use to store his possessions.  Agent Downs testified that upon finding the backpack on the floor of the room, nothing was protruding from it and it was closed prior to its search.  Crist said that she and the Defendant maintained separate luggage; that morning Defendant had already packed his bags as they prepared to leave, while she was still gathering and packing her things.  Crist described Purcell as a private

---

[2]Specifically, when defense counsel indicated during hearing that Defendant would take the stand to testify about the luggage, the Government questioned the relevancy of any such testimony. Upon the Court's inquiry whether the United States intended to argue the point, the Government stated that it had not, nor did it intend to argue that Defendant did not have an expectation of privacy in the items searched.

person.  Essentially, she testified that his things were his, and her things were hers.  Going through his belongings was not something she would have ever done and so she had never received nor asked for permission to look through his bags.  All of this evidence demonstrates that Defendant had a subjective expectation of privacy in his luggage, including the duffel and backpack.

The second inquiry of the privacy analysis is whether a defendant's subjective expectation of privacy is one society recognizes as reasonable under the circumstances. *King*, 227 F.3d at 744.  As both this Circuit and the Supreme Court have noted, an occupant of a hotel room retains a reasonable expectation of privacy. *United States v. Atchley*, 474 F.3d 840 (6th Cir. 2007), *Stoner v. California*, 376 U.S. 483 (1964).  Unlike *Waller*, Defendant herein did not store his luggage in a bedroom closet but rather left it on the floor of his motel room.  But the defendant in *Waller* was not actually living nor had stayed overnight at those particular premises, but rather left his things in a bag in a closet after expressly asking the premises occupant if he could store his belongings there.  Here, Defendant was actually staying in the hotel room, not just storing his things.  And according to Crist, they were also planning to check out.  Under these circumstances, that his personal luggage would be on the floor of a private room he co-habitated would not be atypical nor otherwise indicate he does not retain an expectation of privacy.  Indeed, in *Bond v. United States*, the Supreme Court held that carry-on luggage on a bus retained a legitimate expectation of privacy despite the fact that the bag was exposed to the public in an overhead carrier rack.  529 U.S. at 335-38.  Here, Defendant did not expose his luggage to the public, but merely left it lying on the floor in his hotel room.  Leaving his bags on the

floor of a private hotel room that, by all accounts he continued to occupy, would not render unreasonable what society would otherwise view as a reasonable expectation of privacy.

### D.     Common Authority

As noted, Crist and Purcell co-occupied the hotel room.  A party other than a defendant may give valid consent, including "'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Morgan,* 435 F.3d 660, 663 (6th Cir. 2006)(quoting *United States v. Matlock,* 415 U.S. 164, 171 (1974)).  "Common authority" is defined as "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."  *Matlock,* 415 U.S. at 171 n.7.

Crist, as a co-occupant of the hotel room, possessed actual common authority to permit a search of that common area occupied by Crist with her co-inhabitant, Defendant. In fact, at the suppression hearing, Defendant indicated he was not disputing that Crist had actual authority to consent to a search of the room generally, provided that consent was valid and voluntary as has already been discussed hereinabove in this Opinion.  But the Government argues the evidence is clear that Ms. Crist had actual common authority to consent to a search of not just the hotel room, but also its contents.  It submits that voluntary consent to search a hotel room includes all contents of that room.  The Court will not make this leap, nor does the case law bear it out.

The Government offers no authority for such broad interpretation of actual common authority of a co-occupant over shared premises.  Other courts have noted that consent to

search is a relative, rather than all-encompassing concept, and have likewise drawn a distinction between premises generally and closed objects on those premises.  "A resident's consent to search his home is not necessarily consent to search a closed object within the home."  *Waller,* 426 F.3d at 845 (citing *United States v. Karo,* 468 U.S. 705, 725-26 (1984)(O'Connor, J., concurring)("A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home."; and *United States v. Rodriguez,* 888 F.2d 519, 524 (7th Cir. 1989)("[T]he United States has not cited a single case approving a search of a closed container in consequence of a general consent to enter the room in which it was found.").

Based on the principles of *Matlock*, although Defendant had a legitimate expectation of privacy in the items searched, the United States can overcome such an expectation if shown that Ms. Crist had common authority over the duffel and backpack.  *Matlock,* 415 U.S. at 171-72.  That is, that she had mutual use of the property because she had joint access or control for most purposes, making it reasonable for the officers to conclude that she had actual authority to permit inspection, of which Purcell assumed the risk.

To exemplify similar joint access or control circumstances, Plaintiff cites to *United States v. Clutter,* 914 F.2d 775 (6th Cir. 1990) and *United States v. Moore,* 917 F.2d 215 (6th Cir. 1990).  The area searched in *Clutter* was the defendants' bedroom, made accessible to them by defendants' children.  But the illegal items (drugs) in that case were open and obvious in that bedroom.  Indeed, the court indicated it need not reach the closer question of whether the children could consent to search of the bureau drawer within the bedroom.  *Id.* at 778.  In *Moore,* authorities seized stolen postal money orders found in a bureau in defendant's bedroom.  They were permitted access to the bedroom by

defendant's girlfriend, a joint occupant of the residence.  *Moore,* 917 F.2d at 219.  *Moore* is more similar to the case at hand in that it involved charges against defendant arising from contraband found not on the premises generally, but within a separate, closed object on those premises – in that case a bureau, and in this case personal bags.  But the actual common authority or joint access to that item was evident in *Moore*.  Specifically, the girlfriend was instructed by defendant to access that area, retrieve some of the stolen items and deliver them to another.  *Id.*  Under those circumstances, the conclusion that defendant bore the risk his girlfriend might permit another to search that area is a reasonable one.

These authorities therefore explain that when there is evidence of joint access and mutual use or shared control, actual common authority to consent exists.  The Supreme Court recognized such in *Frazier v. Cupp,* 394 U.S. 731, 740 (1969), upholding the search where defendant's relative permitted the search of a duffel bag that was being used jointly by both defendant and the relative.  The Court reasoned that by the relative's joint access and use of the bag defendant assumed the risk the other would allow someone to look inside.  *Id.*

No similar evidence was offered by the Government in this case to support actual common authority over the duffel bag or the backpack.  Ms. Crist gave no testimony that would suggest she enjoyed any mutual use, access, or control of the duffel bag or backpack or the items within it, and the Government has provided no evidence to refute this claim.  As to the backpack, the fact that she was the owner and so had a property interest in it does not give her authority to consent to a search when she had also given Defendant exclusive use of it.  More significantly, agents were not even aware she owned the backpack until they asked her *after* completing its search.  No evidence was elicited from

Crist or others that would establish she had common authority over either the duffel bag or the backpack, that during that time she had mutual use of either of the bags, or that she had joint access or control for most purposes, *Waller,* 426 F.3d at 845, or any purpose. Accordingly, the Court finds the evidence insufficient to establish that Crist had actual common authority to consent to a search of either the duffel bag or the backpack.

### E.   Apparent Authority

The final inquiry on Defendant's motion is whether officers reasonably believed that Crist had authority to consent to a search of the bags, even though in actuality she did not. That is, having determined that Defendant retained a legitimate expectation of privacy in the luggage and that Ms. Crist had no common authority to consent to a search, the government can still prevail in this matter if they can show that the agents justifiably relied on Ms. Crist's apparent authority.  *Waller*, 426 F.3d at 846.

A search is valid under apparent authority if "the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 846, *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). Whether the agents reasonably relied on apparent authority depends on an examination of all the surrounding circumstances. *Rodriguez*, 497 U.S. at 188.

However, the government cannot use apparent authority as a basis for conducting its search if the agents were faced with an ambiguous situation yet proceeded without making further inquiry.  In examining what circumstances can place in issue the reasonableness of an officer's reliance upon a third party's apparent authority to consent to search, the Sixth Circuit's focus in *Waller* was directed specifically to the apparent

authority to search a closed item found on the searched premises.  The boundary of that examination, according to the *Waller* court, is driven by the ambiguity of the situation.

> The government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.  If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'"

*Waller,* 426 F.3d at 846 (citation omittted).

In this case, the Government concedes that Defendant had a legitimate expectation of privacy in the luggage.  At the point in time officers arrived on the scene and proceeded to room 250, they had knowledge that Defendant was a guest at the hotel, was accompanied by a female, and was getting ready to check out.  And when Crist answered the hotel room door, the presence of the female was corroborated.  When they made the initial sweep to check for a lab, closed pieces of luggage were in view in the room, some of which were stacked neatly on the floor, corroborating that Purcell was checking out.  And upon speaking to Ms. Crist prior to searching the room, she corroborated that she and Defendant were guests in the room, that she was his girlfriend, that they had been there at least the past few days, and that they were checking out.  Thus, the co-occupancy of the room was unequivocally confirmed for agents prior to their search of the room, rather than learned after the fact.

Given that luggage "is the type of container that 'historically commend[s] a high degree of privacy,'" *id.* at 848 (citation omitted), agents observed closed luggage in the private hotel room, and agents were aware of the co-occupancy, sufficient ambiguity was present to necessitate further inquiry that Crist had actual common or apparent authority

-18-

to consent to a search of that luggage.  The *Waller* court references numerous other decisions involving circumstances imposing a duty upon law enforcement to make further inquiry where joint use or access by a consenting third party was unclear.  *Id.* at 847.

Applying these principles, the first inquiry here is: did Crist have the apparent authority to consent to a search of the duffel bag, the first bag searched?  In answering this question, any contention by government agents that there was no ambiguity in the circumstances here is belied by the fact that they made further inquiry of Crist before searching this first bag.  Agent Rolfsen testified that Crist was, in fact, asked who owned that particular bag, and she responded that it was hers before it was searched .  Thus, the surrounding circumstances were such that they created ambiguity as to ownership and access to closed luggage in the room, and the officers made the requisite inquiry contemplated by *Waller.*  Their reliance upon Crist's response was reasonable, as there was no evidence offered to suggest reason to doubt the accuracy or truthfulness of her response that the duffel bag was hers.

Ms. Crist testified she did not recall being asked about the bag, but weighing the overall testimony leads the Court to believe that Agent Rolfsen's testimony on this point is likely more accurate and is therefore accepted by the Court.  Crist's purse was located on top of the duffel bag, and the close proximity of this personal item of hers suggests a connection with the duffel bag upon which it had been set.  And Crist's testimony on this point was not unequivocal and suggested her recollection might be faulty.[3]  Thus, even though Crist did not have actual authority to consent to a search of the duffel bag, when

---

[3]When asked whether the duffel bag was brought to her and she was asked about it, she responded "I don't think so.  I don't think so."

she indicated to officers that the bag was hers, the officers reasonably could conclude that she had apparent authority to consent to the search of that closed item.

However, to the extent there was any viability to the Government's argument that the circumstances presented to them created no ambiguity requiring further inquiry as to Crist's common authority, that viability was extinguished with the search of that first bag. Agent Rolfsen confirmed that once the search revealed marijuana and *men's* clothing inside, "at that point in time, I believe the bag – the contents of the bag probably did not belong to her." Thus, further inquiry under *Waller* was required before searching the other bags. Indeed, the fact that Crist was asked whether this first bag searched was hers evidences that police were aware common or joint ownership and access were lacking or unclear. Nevertheless, and despite the information known at this point that would negate any arguably apparent authority, officers proceeded to search the closed backpack without further inquiry, then question Crist about its ownership and use afterward.

The Court finds the Government's efforts to distinguish the application of *Waller* to the within matter are unavailing. The United States maintains that *Waller* is not relevant because it involves a guest/host relationship rather than the boyfriend/girlfriend relationship involved here, where it is less likely a host would have mutual access to his guest's private belongings, versus joint authority being shared based on the existence of the more personal relationship of boyfriend/girlfriend. But joint or shared access are not presumed simply because the co-occupants or co-owners share an intimate relationship such as boyfriend/girlfriend or husband/wife. *See United States v. Morgan,* 435 F.3d 660, 663-64 (6th Cir. 2006)(wife had valid apparent authority to authorize search of home computer, despite later-learned facts raising doubt about that authority, since at the time of the

search, the computer was in a common area of the home, wife told officers she had access to and used it, niether she nor spouse had individual passwords, and she had installed software on it).

The *Salinas-Cano* case cited by the Sixth Circuit in *Waller* is instructive in that it also involves a boyfriend/girlfriend relationship. The Sixth Circuit notes that:

> [*United States v. Salinas-Cano,* 959 F.2d 861 (10th Cir. 1992)] involved a defendant who left his closed suitcase at his girlfriend's apartment. *Id.* at 862. After the defendant's arrest, the police sought and acquired consent to search the suitcase only from the girlfriend. *Id.* In examining the girlfriend's consent to search the suitcase, the court noted several factors, including (1) the type of container, because certain container types "historically command a high degree of privacy"; (2) whether the owner took any precautions to manifest his subjective expectation of privacy; (3) whether the host of the premises initiated police involvement (e.g., officers invited to search an item during a response to a domestic violence report); and (4) whether the consenting party displayed a lack of interest in the item (e.g., disclaiming ownership). *Id.* at 864. The Tenth Circuit held the search of the suitcase unlawful because it was "a type of container long associated with privacy expectations," *id.* at 865, the defendant had testified to his subjective expectation of privacy and had never permitted his girlfriend to look inside the suitcase, *id.,* he had not abandoned the suitcase but "instead maintained a periodic presence in the apartment[,]" *id.,* and the agents had not questioned his girlfriend in a manner sufficient to determine whether she had mutual use of the defendant's suitcase, *id.* at 866.

*Waller,* 426 F.3d 848. Nothing about *Salinas-Cano* suggests the presence of a boyfriend/girlfriend relationship makes it more reasonable for officers to believe, *without further inquiry,* that there is joint access and control by virtue of the fact that the persons involved are a couple.

The Government submits that Crist never once told them that she did not have authority to allow them to search the bags. However, no such affirmative obligation is imposed upon her to volunteer such information. *Waller* imposes the obligation of resolving the ambiguity upon the agents requesting access.

During the hearing, the officers testified about the lack of name tags or identifiers on the luggage, and the general messiness of the hotel room. This was apparently in an effort to emphasize that they could not tell "whose property was whose," as testified to by Agents Scott and Downs. But it is also undisputed that there were closed pieces of luggage in the room, among them the duffel bag and backpack. Agent Rolfsen testified that the room was in disarray, with clothes everywhere, plastic bags and plastic containers with clothes in them, and pots and glassware in the bathroom. But he also testified that "some bags were stacked neat by the door," as did ATF Agent Downs. The officers were on notice that two people were staying in that room. There is no suggestion in *Waller* nor has the Government cited authority that the further inquiry necessitated by ambiguous circumstances is excused if the closed container is not marked or is surrounded by other personal items openly strewn about the area. Indeed, such could just as easily be viewed as enhancing the ambiguity, where law enforcement is plainly aware the premises being searched are also occupied by and includes belongings of one other than the one from whom consent is being sought. Felix Unger does not lose his expectation of privacy in his untagged closed luggage placed in the shared common hallway of his apartment merely because Oscar Madison is his roommate.

The Government also emphasizes that Crist "expressed a desire for the police to find [the gun]" she had told them was in the room. Actually, the fact that there was a gun in the room was told to police by Crist in response to Agent Rolfsen asking her if there was "anything in the room that would hurt [them] if [they] were searching because [they] did not want to get injured." The United States argues that Crist had joint access and control to this gun, and therefore had joint access to the bags that might contain it. However, such

-22-

bootstrapping provides no lawful ground for the warrantless search of Defendant's bags. While Crist may have borrowed the gun from her mother, no evidence was offered at hearing to establish that she in fact had joint access and control to it and that agents were made aware of such.  Indeed, agents would have cause to further question any such professed joint access and control to the gun, given that Crist expressed to them that she did not have any idea where it might be in the room and testified at hearing that she just knew "it wasn't in my bags on the bed."  Such circumstances do not support the assumption that Crist had mutual use of and access to the closed luggage in the room.  At best, they simply raise questions about the ownership and access to the gun, questions that were not asked by police.

The Court recognizes that law enforcement agents often have to make quick decisions in the course of an investigation to protect themselves and others from possible danger. *United States v. Foster*, 376 F.3d 577, 587 (6th Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 1, 28 (1968)). It is unreasonable to prevent law enforcement officials from taking reasonable measures to ensure their safety while asking them to "decide instantaneously what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized." *Michigan v. Long*, 463 U.S. 1032, 1052 n. 16 (1983).

In the current situation however, the agents' fears that Defendant was operating a meth lab were certainly warranted due to Defendant's history.  But once that concern ended, the presence of closed luggage in the room, coupled with the agents' knowledge that Purcell was staying there, should have prompted further questioning by agents to be sure Crist could give valid consent to a search of those bags.  Similar to *Waller*, the agents' failure to make a further inquiry is exacerbated by the fact that both occupants were in

-23-

close proximity to the scene and were easily accessible for questions. *Waller*, 426 F.3d at 849. It would not be overly burdensome for agents to have asked either of them to whom each bag belonged to prior to opening it. *Id.* While the Court does not endeavor to bind law enforcement's hands, agents must take appropriate steps in ambiguous situations to ensure Fourth Amendment protections when the safeguards are easily attainable.

### IV.    CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)    Defendant Motion to Suppress (Doc. #14) be, and it is, hereby **granted in part** and **denied in part**;

(2)    Defendant's Motion to Suppress is **granted** as to the orange and dark colored backpack and its contents, including the firearm;

(3)    Defendant's Motion to Suppress is **denied** as to the greenish/orange duffel bag and its contents, including the marijuana;

(4)    The time period from November 21, 2006 through the date of this Order, totaling 122 days, is deemed **excludable time** pursuant to Title 18, U.S.C.  3161(h)(1)(F); and

(5)    This matter is hereby scheduled for a **Status Conference** on **April 4, 2007 at 1:30 p.m.**

This 23rd day of March, 2007.



Signed By:

*David L. Bunning*   DB

**United States District Judge**